**JOSEPH DENUNZIO FRUIT CO. v.
CRANE et al.
No 6940 O'C. Civil.**

District Court, S. D. California.
Central Division.
June 16, 1948.

George C. Lyon, of Los Angeles, Cal., and Brown & Eldred, by Marshall P. Eldred, all of Louisville, Ky., for Joseph Denunzio Fruit Co.

Henry O. Wackerbarth, of Los Angeles, Cal., for Raymond M. Crane, doing business as Associated Fruit Distributors of California.

Ralph Moradian and G. L. Aynesworth, both of Fresno, Cal., for John C. Kazanjian, doing business as Red Lion Packing Co.

J. F. T. O'CONNOR, District Judge.

*Preliminary statement:*

For a clarification of the factual situation in this case, resulting considerably from the complex inter-relationship of the parties hereto under the legal doctrine of Principal and Agent, culminating in this litigation, it is necessary to understand, in limine, that there are just four parties involved in this litigation, namely: (1) Raymond M. Crane, an individual doing business as Associated Fruit Distributors of California, with a place of business in Los Angeles, California; (2) John C. Kazanjian, an individual doing business as Red Lion Packing Company, in Exeter, California; (3) A. B. Rains, Jr., a food broker, in Louisville, Kentucky; and (4) the Joseph Denunzio Fruit Company, a corporation organized and existing under the laws of the State of Kentucky, with its principal offices in the City of Louisville, Kentucky.

Raymond M. Crane is a broker or carlot distributor; and John C. Kazanjian is a grower of grapes, and operates a packing house at Exeter; and there is no dispute about the fact that both Raymond M. Crane and John C. Kazanjian are licensed, or subject to license, under the Perishable Agricultural Commodities Act of 1930, 7 U.S.C.A. § 499a et seq., each as a dealer, commission merchant and/or broker.

There is no dispute that whenever Raymond M. Crane performed any act herein, he was acting as and for the Associated Fruit Distributors of California as its alter ego and vice versa, and that whenever John C. Kazanjian performed any act herein, he was acting as and for the Red Lion Packing Company as its alter ego and vice versa.

A correct solution of the problems involved in this case depends, inter alia, upon the proper interpretation to be placed by this court on the written communications (telegrams and teletype messages) exchanged between Raymond M. Crane (in whatever capacity whatever) and A. B. Rains, Jr.; the Statute of Frauds of California; Damages; Agency; O.P.A. Regulations; and the question of compelling a party suing an agent and an undisclosed principal to elect whom he will hold liable in damages. Each problem will be discussed seriatim herein.

Because the court in this case does not derive jurisdiction by reason of the diversity of citizenship of the parties involved herein, but solely because a federal question is involved, the question of citizenship and domicile or residence of the parties is not important except for an orientation of the parties.

*The alleged contract in suit:*

The primary question for determination is whether or not there was a binding contract entered into between Raymond M. Crane (regardless of his capacity, i. e., whether acting as a buying agent or broker for A. B. Rains, Jr.; a principal; or as a selling agent or broker for John C. Kazanjian) and A. B. Rains, Jr., by their written communications (telegrams and teletype messages) hereinafter to be specifically referred to, because without a binding contract all other questions in the case become moot.

*Original offer by Associated Fruit Distributors of California to A. B. Rains, Jr.:*

This law suit had its genesis when Associated Fruit Distributors of California, the alter ego of Raymond M. Crane, sua sponte, and without any prior solicitation from A. B. Rains, Jr., sent to A. B. Rains,

Jr., food broker with whom it had dealt for several years, and twelve other prospective purchasers of grapes, a telegram (teletype) dated September 26th, 1944, offering to *book* nine cars of Emperors U. S. No. 1 (grapes), and nine cars of Emperors unclassified (grapes), or eighteen cars of vineyard-run grade to go into storage, packing to commence October 9th, at the rate of one or two cars daily, to be inspected by Associated Fruit Distributors of California, to be shipped *f. o. b. acceptance final* on the basis of their inspection, *title to be transferred on or after December 10th,* the shipper to pay all storage charges, at a price of two dollars and fifty-three cents per lug net to shipper, which was the ceiling price at the time under OPA regulations, *Associated Fruit Distributors to be paid fifty dollars per car procurement charge.* The offer was made subject to confirmation, and A. B. Rains, Jr., was directed to wire his answer.[1]

*Counter-offer by A. B. Rains, Jr., to Associated Fruit Distributors of California:*

By teletype, dated September 28, 1944, Joseph Denunzio Fruit Company, through its broker, A. B. Rains, Jr., made a counter-offer to the said Associated Fruit Distributors by offering to take two cars of grapes unclassified to be shipped to Louisville when packed, and two cars of U. S. No. 1 grapes to be stored, as set out in Associated Fruit Distributor's original offer of September 26, 1944.[2]

*Rejection by Associated Fruit Distributors of A. B. Rains, Jr.'s counter-offer:*

By a telegram dated September 28, 1944, Associated Fruit Distributors rejected A. B. Rains, Jr. counter-offer.[3]

*Revised offer by Associated to A. B. Rains, Jr.:*

Subsequently by a telegram, dated October 2, 1944, Associated Fruit Distributors transmitted to broker, A. B. Rains, Jr., a revised offer whereby Associated offered to sell fifteen cars of U. S. No. 1 Emperor grapes on the same basis with respect to packing, storing, shipping and inspection as set up in the original wire of September 26, 1944, but at a different price, a price of two dollars and fifty cents per lug, net, and A. B. Rains, Jr., was directed to wire his answer if any part of these was wanted.[4]

---

[1] (Western Union telegram) Los Angeles, Calif., Sept. 26, A. B. Rains: Can *book* emperors nine cars usone nine cars unclassified or 18 cars vineyard-run grade to go into storage packing to commence rate of one or two daily October 9th we to personally inspect afohd (F. O. B. acceptance final) Basis our inspection shipper to trans title on or after December 10th, *he paying all storage charges.* Packed 28# net display new lugs lidded calripe or comparable brand 500.00 part payment with confirmation price 2.53 net to shipper which ceiling that time *we charging 50.00 car procurement charge* adlam *(offer subject to confirmation).* Corlu (wire immediately, must have answer by) Thursday. Adlas (offer subject to confirmation F.O.B. shipping point) immediate UPTMV (6 x 6 and larger) new crop edison district ALBIA (approximately 85%) 3.25 can secure 3-4 cars uninspected account running heavy puff heavy sidewalls would grade albieiq (approximately 80% 85%) except for puff which not serious defect account heavy sidewall 2.50.
Associated Fruit Distributors of Calif. (Italics supplied.)

[2] Associated Fruit Distributors of Calif., Sept. 28-44. Rains, LSVL. OK on that Emperor deal Denunzio cant use that many but will take 2 cars unclassified to be shipped to Louisville when packed on the net delivery ceiling when shipped and 2 cars usone to be stored there on your terms. *To pay you $50.00 per car buying charges and Denunzio pays us our brokerage.* (Italics supplied.)

[3] Western Union telegram. Los Angeles,, Calif., Sept. 28, A. B. Rains, Jr., Referring Emperors impossible make deal except as quoted our nite letter dupur (How about) Tomato business others buying Dunne (depending on you) Those we favor with grapes give us tomato business. Associated Fruit Distrs. of Calif.

[4] Western Union telegram: Los Angeles, Calif., Oct. 2, A. B. Rains, Jr. CPFGP (referring to our night letter of 26) quoting futures emperors secured revised deal fifteen cars usone 2.50 net same deal corsu. (wire quick if wanted) any part —Associated Fruit Distributors of Calif.

*Acceptance by A. B. Rains, Jr., of revised offer of Associated Fruit Distributors of California:*

By a teletype, dated October 3, 1944, Joseph Denunzio through A. B. Rains, Jr., accepted Associated Fruit Distributors' offer of October 2, 1944, as to three cars of U. S. No. 1 Emperors. In this acceptance Associated Fruit Distributors was requested to airmail inspection slips when the grapes were stored, upon receipt of which Joseph Denunzio would make a deposit of $750.00 per car.[5]

*Confirmation by Associated Fruit Distributors of A. B. Rains, Jr.'s acceptance of contract:*

By a teletype message, dated October 3, 1944, Associated Fruit Distributors confirmed Joseph Denunzbio's acceptance of its offer, and the name of Red Lion Packing Company is mentioned for the first time as a shipper.[6]

(Note: It is the contention of A. B. Rains, Jr., that Red Lion Packing Company was mentioned herein solely in connection with another deal in which Joseph Denunzio was not concerned.)

*Broker's Standard Memorandum of Sale:*

On October 3, 1944, broker A. B. Rains, Jr., prepared a Broker's Standard Memorandum of Sale which he numbered 2011. This Memorandum showed the date of the order and the date of the Confirmation as October 3rd, 1944. *It showed the buyer to be Joseph Denunzio Fruit Company of Louisville, Kentucky; the seller to be Associated Fruit Distributors of Los Angeles, California; and the time of shipment to be around December 10th. It showed the sale was to be made F. O. B. and that payment was to be made by sight draft attached to the bill of lading. It showed that fifty dollars per car was to be paid to the shipper as a procurement charge, and that the* Broker, A. B. Rains, Jr., was to be paid by the buyer (Joseph Denunzio) twenty-five dollars per car for his brokerage services. *The Memorandum described the goods sold as two cars U. S. No. 1 California Emperors at a price of two dollars and fifty cents per lug net f. o. b. to be packed around October 8th to 10th and stored in cold storage, title to remain in shipper's name until December 10th. It provided that $750.00 per car deposit was to be made upon receipt of confirmation from California by air-mail, contingent upon cars grading U. S. No. 1.28 pounds, net, new display lugs.*

This Memorandum of Sale contained the following provision:

"When the terms of sale have been agreed upon the broker shall fill out this Standard Memorandum of Sale in triplicate, sending one copy to the seller, one to the buyer and retaining the third copy for his own file. Unless the seller or the buyer makes immediate objection upon receipt of his copy of this Standard Memorandum of Sale, showing that contract was made contrary to authority given the broker, he shall be conclusively presumed to agree that the terms of sale as set forth herein are fully and correctly stated."

*Correction of the Memorandum of sale by A. B. Rains, Jr.:*

Thereupon, by a telegram dated October 9, 1944, broker, A. B. Rains, Jr., on behalf of Joseph Denunzio, corrected the number of cars of grapes as shown in the Memorandum *from two to three,* Joseph Denunzio's acceptance of Associated Fruit Distributor's offer, dated October 3, 1944, having called for *three* cars. A. B. Rains, Jr.'s telegram of October 9, 1944, corrected the Memorandum of Sale to conform to the original acceptance of Associated Fruit Distributor's offer.[7]

---

[5] Associated Los AGXX Angeles, Oct, 3, R. Rains, LSVL also conf. Denunzio 3 cars. All Usone Ehnps to be inspected when stored and airmail inspect slips they will put up the $750.00 deposits now of course contingent upon receiving inspect reports when stored GA.

[6] Oct. 3, 1944. A. B. Rains, Jr. Louisville, Ky. Talked shipper Red Lion Packing Company confirms Krotski necessary 750. car airmail deposits with signed confirmations Emperors available now only two more cars possibly three same basis * * * Associated Fruit Distributors of Calif.

[7] Associated Fruit Distributors of Calif. Los Angeles Calif. Oct. 9, Reference our sales Memo 2011 Error change Aooae (3 cars) instead Aooad (2 cars) Quote Unded (U.S. No. 1 straight pack)

*Correction accepted by Associated Fruit Distributors of California:*

By a telegram dated October 9, 1944, sent to broker, A. B. Rains, Jr., Associated Fruit Distributors accepted the correction on the number of cars of grapes stated in the Memorandum of Sale, and requested a further correction in said Memorandum by changing the terms to *"f. o. b. acceptance final."* (Italics supplied.) For a case distinguishing between F.O.B. and F.O.B. acceptance final, see Dyal v. Allen, 4 Cir., 161 F.2d 152. The wire further stated: "If you do not wire immediately to the contrary we will understand this is satisfactory."[8]

No objection was made by A. B. Rains, Jr., and no further communications were sent or received relative to the contents of the Memorandum of Sale, and it may, therefore, be presumed that said Memorandum of Sale, after the two corrections above detailed, was satisfactory to both parties.

*Repudiation of contract by Red Lion Packing Company, as principal; and by the Associated Fruit Distributors of California, as agent.*

Later, by a telegram dated October 10, 1944, Associated Fruit Distributors of California mentioned the Red Lion Packing Company, declaring that said Red Lion had repudiated the contract.[9] Parenthetically, it is the contention of Joseph Denunzio that this is the first time Red Lion Packing Company (the alter ego of John C. Kazanjian) has been mentioned as the shipper, whereas Raymond M. Crane contends that John C. Kazanjian was mentioned in this case as the shipper in Note 6; and, by a telegram dated October 13, 1944, Associated Fruit Distributors repudiated, as agent, the contract of sale hereinabove referred to.[10]

*Purchase of other grapes by Joseph Denunzio:*

The record shows that as soon after December 10, 1944 (date shipment was to have been made under the terms of the contract), as possible, Joseph Denunzio purchased other grapes to replace those Associated Fruit Distributors failed to ship. Between the dates of October 10, 1944 (first notice of repudiation of contract by Associated Fruit Distributors), and December 10, 1944 (date for performance of contract), Joseph Denunzio made an effort to induce the Associated Fruit Distributors to comply with the contract, and also sought compliance by requesting the aid of the Regulatory Division of the Fruit and Vegetable Branch.

Efforts to obtain compliance by the Associated Fruit Distributors of its obligation under the contract having failed, and the date of performance of the contract having passed, Joseph Denunzio purchased three cars of U. S. No. 1 Emperor grapes as soon as they were available, and at the best market price obtainable, as follows: One car on December 20, 1944, one car on January 3, 1945, and the last car on January 22, 1945. These three cars cost Joseph Denunzio exclusive of transportation charges, a total of $14,011.00, which exceeded the contract price for the three cars previously purchased from the Associated Fruit Distributors by $5,723.50.

Cadop (Rolling just out or immediate shipment). A. B. Rains, Jr.

[8] Western Union, Los Angeles, Calif., Oct. 9, A. B. Rains, Jr. Correcting number 2011 Also terms Afohd (F. O. B. acceptance final) corqo (if you do not wire immediately to the contrary we will understand this is satisfactory) Emperors * * * Associated Fruit Distributors of Calif.

[9] Western Union. Los Angeles, Calif., Oct. 10, A. B. Rains, Jr. Shipped Redlion takes view account ceiling lifted any contracts Emperors voided willing go along give you trade preference shipping as packed at market price which today 3.25 AFOHD (F. O. B. acceptance final)

Advise. Associated Fruit Distributors of Calif.

[10] Western Union. Los Angeles, Calif., Oct. 13, A. B. Rains, Jr. Useless Denunzio Krotzki take attitude we principals could not legally charge procurement in that event, furthermore wired you nite letter when confirmed "shipper Redlion Packing Company confirms" Furthermore we acting as agents Dunor (doing all that is possible) Get settled amicably however Dumta (as a matter of fact) until you get confirmation straightened out correct terms FOB acceptance final not FOB theres really no deal Dutih (we are working) doing best possible. Associated Fruit Distributors.

*Proceedings before the War Food Administrator:*

Complaint was made in writing by Joseph Denunzio Fruit Distributors, in its corporate capacity against Raymond M. Crane, doing business as Associated Fruit Distributors of California, and also against John C. Kazanjian, doing business as Red Lion Packing Company, as respondents, before the War Food Administrator, Department of Agriculture, on September 10, 1945, to recover damages in the sum of $5,723.50 with interest.

■ After a full hearing before the Board, the Trial Examiner for the Department of Agriculture rendered an order or award, dated February 26, 1947, in favor of the Joseph Denunzio Fruit Company, Corporation, against Raymond M. Crane, doing business as Associated Fruit Distributors of California, in the sum of $5,723.50, with interest thereon at 5% per annum from December 10, 1944, until paid; and an order was made by the Trial Examiner dismissing the action against the respondent, John C. Kazanjian, doing business as Red Lion Packing Company. Those orders were affirmed on the appeal prosecuted by Raymond M. Crane, doing business as Associated Fruit Distributors of California, before the Board, by the Secretary's Order or award dated April 8, 1947. The presumption is that said orders were correct and should be sustained by the court.[11]

*Appeal to the District Court:*

■ Thereafter, an appeal from the ruling of the Secretary of Agriculture was perfected to this court, pursuant to Sec. 499g (c) of Title 7 U.S.C.A. by Raymond M. Crane, doing business as Associated Fruit Distributors of California, the appellant here and the respondent before the War Food Administrator, against Joseph Denunzio Fruit Company, a corporation, complainant before said Administrator and the appellee here, and against John C. Kazanjian, doing business as Red Lion Packing Company, the other respondent before said Administrator and the appellee here. The record of the proceedings before the Secretary of Agriculture including the preliminary statement, the Findings of Fact, and Conclusions, and the Order of February 26, 1947, has been filed in this court. While the findings of Fact and the Order of the Secretary are prima facie evidence of the facts stated therein, the trial in the federal district court is, nevertheless, a trial de novo, and has been treated as such in fact.

The issues involved, seriatim, as the court views them, are as follows:
*Contract law:*

(1) Was there a valid contract for the sale of these grapes entered into between Raymond M. Crane (in whatever capacity) and A. B. Rains, Jr.;

Note: This involves the question of (a) Offer and acceptance or a meeting of the minds; (b) The California statute of frauds relative to the status of teletype messages—an apparent res nova; and (c) the provision for a $750.00 per car deposit which was not made by the buyer;

*Damages:*

(2) The measure of damages;
*Agency:*

(3) The interrelationship (status) of the parties herein;
*Sales:*

(4) The question of the $50.00 per car procurement charge vitiating the contract under O.P.A. regulations; and

*Rules of Procedure:*

(5) Duty of the court to compel a plaintiff to elect, at the close of the evidence, between an agent and an undisclosed principal, as to whom it will hold liable in damages.

*Was there a sufficient meeting of the minds between Raymond M. Crane and A. B. Rains, Jr., to constitute a binding contract under California law?*

While the negotiations for the sale and purchase of these grapes took place at all times by written communications (telegrams and teletype messages) between Raymond M. Crane, while in Los Angeles, California, and A. B. Rains, Jr., while in

11 7 U.S.C.A. § 499g (c); Barker-Miller Distributing Co. v. Berman, D.C.N.Y., 8 F.Supp. 60; Spano v. Western Fruit Growers, 10 Cir., 83 F.2d 150; Smith v. White, D.C., 48 F.Supp. 554.

Louisville, Kentucky, this court, in deciding if these negotiations resulted in a binding agreement, i. e. an offer and acceptance, (a meeting of the minds), is fortunately not presented with the perplexing problem of determining whether or not the said negotiations are to be controlled under the lex fori, the lex loci contractus, or the lex loci solutionis, for counsel have stipulated that the substantive laws of the State of California (statutory and case) shall control.

Under Sec. 1550 of the Civil Code of California there are four basic essentials to the existence of a contract, namely: (1) Parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration.

All of the foregoing essentials are admitted to exist in this case except consent, or a meeting of the minds.[12]

Sec. 1582 of the Civil Code provides that "if a proposal prescribes any conditions concerning the communication of its acceptance, the proposer is not bound unless they are conformed to; but in other cases any reasonable and usual mode may be adopted;" (Note: The acceptance was made by teletype message in this case.)

Sec. 1583 of the Civil Code provides that "consent is deemed to be fully communicated between the parties as soon as the party accepting a proposal has put his acceptance in the course of transmission to the proposer, in conformity to the last section" and

Sec. 1585 of the Civil Code provides that "an acceptance must be absolute and unqualified, or must include in itself an acceptance of that character which the proposer can separate from the rest, and which will conclude the person accepting. A qualified acceptance is a new proposal."

From an analysis of the telegrams and teletype (Notes 1 to 6 incl., supra) the court is satisfied that, under the laws of the State of California, a binding contract, so far as consent or a meeting of the minds was concerned, was created on October 3, 1944 (Note 6),. when the Associated Fruit Distributors of California, as confirmor, confirmed Joseph Denunzio's acceptance of its offer, the said Joseph Denunzio being the offeree and the Associated Fruit Distributors of California being the offeror. The court is satisfied that there was a meeting of the minds, and that a binding contract thereby came into existence.[13]

The California Civil Code, while it specifically provides when an acceptance under a contract takes place (Sec. 1583), does not indicate at just what particular moment this contract came into existence, assuming that we are dealing with Raymond M. Crane as the confirmor, i. e., when the confirmation was put in the course of transmission to A. B. Rains, Jr., or when it was literally received by him, but this particular point is immaterial.

The court is here dealing with a practical situation where the parties to the contract undoubtedly understood in advance that their negotiations were not to be subsequently merged into a written contract, but that they were dickering at arm's length with each other, *then and there,* for a contract on the best terms possible; and both parties were experienced in brokerage transactions and the customs of the trade. The court is well aware of the line of decisions dealing with a pro-

---

[12] The rule requiring the meeting of minds and an agreement on the terms of an offer and acceptance is set forth in 6 Cal.Jur. p. 43, Sec. 24.

[13] A contract may be formed by telegraph (Williston on Contracts. Sec. 82 and 83; Humphry v. Farmers Union & Milling Company, 47 Cal.App. 211, 190 P. 489); and an informal contract may constitute an agreement between the parties and result in a binding obligation on both parties although the parties subsequently reduce their agreement to a more formal contract (Levin v. Saroff, 54 Cal.App. 285, 201 P. 961; Nisley Company v. Rudolph & Bauer, 7 Cir., 64 F. 2d 571).

It is well established that a telegram satisfies the requirements of the statute of frauds (Williston on Contracts. Sec. 568; Brewer v. Horst & Lachmund Company, 127 Cal. 643, 60 P. 418, 50 L.R.A. 240; Gibson v. De La Salle Institute, 1944, 66 Cal.App.2d 609, 152 P.2d 774; Kelley-Clarke Company v. Leslie, et al., 61 Cal.App. 559, 215 P. 699; Bowles v. Jung, S.D.Cal.1944, 57 P.Supp. 701; Simmons v. Birge Company, S.D.Cal. 1943, 52 F.Supp. 629.

posal to deal as not constituting an offer which can be turned into an agreement by acceptance, but the fact that Raymond M. Crane's original proposal made the acceptance of A. B. Rains, Jr., subject to the confirmation of the offeror, did not place these negotiations in that category.[14]

The contention of Raymond M. Crane that the use of the word "book," in his original telegram dated September 26, 1944, to A. B. Rains, Jr. (Note 1), indicated an intention not to make an offer for the sale of the grapes at that time but was more in the nature of a solicitation for an offer, is likewise untenable in view of the technical definition of the word "book" used as a verb.[15]

*Provisions of the contract entered into:*

There is no contention made by the Associated Fruit Distributors of California that A. B. Rains, Jr., did not accept the proposal in the manner requested by the offeror; and it is the opinion of this court that, by the terms of the contract, Raymond M. Crane (either as a principal or as an agent for an undisclosed, or partially disclosed principal, and whose status will be discussed infra), became obligated to sell, and A. B. Rains, Jr., as a buying broker, on behalf of the Joseph Denunzio Fruit Company or the said Joseph Denunzio, became obligated to buy, three cars of the grapes in question at $2.50 per lug, f. o. b. acceptance final, with a procurement charge to the shipper, Raymond M. Crane of $50 per car, and with the further provisions that $750 per car deposit was to be made by A. B. Rains, Jr., or Joseph Denunzio upon receipt of confirmation from California by airmail of the storage of the grapes. The Broker's Standard Memorandum of Sale was not a contract for it was not signed and not intended to be signed by the parties, but simply what it purported to be.

The fact that the broker, A. B. Rains, Jr., in making out his Standard Memorandum of Sale, showed the sale to cover *two* cars instead of *three,* and left off from the f. o. b. the "acceptance final," which errors were mutually subsequently corrected to conform to the prior negotiations, did not, in the court's opinion, interfere with the prior acceptance of the offer by A. B. Rains, Jr., as confirmed by the Associated Fruit Distributors, constituting an executed contract.

*Contentions of Raymond M. Crane that the contract is invalid:*

The said Raymond M. Crane, however, contends that even assuming there was a meeting of the minds, or an offer and acceptance, the contract is unenforceable inter alia, for the reasons that (1) the teletype messages do not constitute an acceptance in writing under the Statute of Frauds of California, Sec. 1624a(1) of the Civil Code and Sec. 1973a(1) of the Code of Civil Procedure; (2) the $750 per car deposit to be made by Joseph Denunzio or A. B. Rains, Jr. upon receipt of confirmation from California by airmail of the grapes reaching a certain status was not made; and (3) the provision for a $50 per car procurement charge to Raymond M. Crane, bringing the total cost of the grapes over the Maximum Price Regulation 426, issued by the Office of Price Administration, vitiated the contract ab initio.

---

14 "Proposals to deal: If a proposal is nothing more than an invitation to the person to whom it is made to make an offer to the proposer, it is not such an offer as can be turned into an agreement by acceptance. Proposals of this kind, although made to definite persons and not to the public generally, are merely invitations to trade; they go no further than what occurs when one asks another what he will give or take for certain goods. Such inquiries may lead to bargains, but do not make them. They ask for offers which the proposer has a right to accept or reject as he pleases. Where, however, there is more than a mere quotation of prices, and the elements of an offer are present, the contract may be completed by acceptance." 13 C.J. Sec. 96 (contracts) and cases cited. 17 C.J.S., Contracts, § 46.

15 The word "booked" means engaged, destined, bound to promise or pledge oneself, to make an engagement. Mente & Co. v. Heller, 99 N.J.L. 475, 123 A. 755, 756.

Letter from plaintiff to defendant, reciting "We have booked your order for alfalfa and sudan grass seed * * * and thank you very much for the same," held to constitute an acceptance of the order. Barteldes Seed Co. v. Fox, 134 Okl. 248, 273 P. 258, 260.

These first two questions will be discussed at this time, and the question of the $50 procurement charge per car will be discussed under the heading of Sales.

*Sec. 1624a(1) of the Civil Code and Sec. 1973a(1) of the Code of Civil Procedure of California, Statute of Frauds— teletype messages:*

This court, in reaching the conclusion that a valid contract existed between Raymond M. Crane (in the capacity hereinafter discussed) and A. B. Rains, Jr., has assumed that the teletype messages satisfied the California Statute of Frauds providing, inter alia, that "a contract to sell or a sale of any goods or chose in action of the value of five hundred dollars or upwards shall not be enforceable by action unless * * * *'Some note or memorandum in writing of the contract, or sale be signed by the party to be charged, or his agent in that behalf.'*" (Italics supplied.)

Raymond M. Crane takes the position that the teletype messages do not satisfy the requirement of the Statute of Frauds of California as constituting a note or memorandum *signed by the party to be charged* or his agent in that behalf; and that therefore the contract was not a binding contract on John C. Kazanjian and/or Raymond M. Crane, citing the case of Dillingham v. Dahlgren, 52 Cal.App. 322, 198 P.

832; Friedman v. Bergin, 22 Cal.2d 535, 140 P.2d 1; Barrios & Co. v. J. R. Garrett Co., 72 Cal.App. 786, 238 P. 155, and Norton v. Overholtzer, 63 Cal.App. 388, 218 P. 637. It is conceded that these teletype messages do not bear the signature in writing of the party to be charged in the sense that they were not literally signed with pen and ink in the ordinary signature of the sender.

As the court understands the modus operandi of the teletype machines in modern business practice, and particularly in connection with this lawsuit, Raymond M. Crane and A. B. Rains, Jr., each had a teletype machine in his office and as the machine was operated in one office, it would type the message or memorandum simultaneously in the other office; each party was readily identifiable and known to the other by the symbols or code letters used, and there is no contention that the messages did not originate in the office of one and terminate in the office of the other. The question is just what does constitute a "signature" or "signing" to satisfy the Statute of Frauds in California.[16]

The court must take a realistic view of modern business practices, and can probably take judicial notice of the extensive use to which the teletype machine is being used today among business firms, particularly brokers, in the expeditious

---

[16] "The term 'signature' includes any memorandum, mark, or sign, written or placed on any instrument or writing, such as a will, with intent to execute or authenticate such instrument, or writing. In re Romaniw's Will, 163 Misc. 481, 296 N.Y.S. 925, 923, * * *

"A 'signature' may be written by hand, printed, stamped, typewritten, engraved, photographed, or cut, from one instrument and attached to another, and a signature lithographed on an instrument by a party is sufficient for the purpose of signing it; it being immaterial with what kind of instrument a signature is made. Smith v. Greenville County, 188 S.C. 349, 199 S.E. 416, 419.

"* * * When a person attaches his name or causes it to be attached to a writing by any of the known methods of impressing his name upon paper with the intention of signing it he is regarded as having 'signed' in writing. Hagen v. Gresby, 34 N.D. 349, 159 N.W. 3, 5, L.R.A. 1917B, 281. * * *

"A signature is the sign on an instru-

ment or document by any mark in token of knowledge, approval, acceptance, or obligation, and by long custom and usage has come generally to mean the name of a person written by himself, and thus to be nearly an exact synonym of autograph; but such signification is not inherent in the word itself. In re Walker's Estate, 110 Cal. 387, 42 P. 815, 816, 30 L.R.A. 460, 52 Am.St.Rep. 104. * * *

"A 'signature' is whatever mark, symbol, or device one may choose to employ as representative of himself. Griffith v. Bonawitz, 73 Neb. 622, 103 N.W. 327, 339."

See Vol. 39 Words and Phrases, Perm. Ed. page 274, et seq. The signature to a memorandum under the statute may be written or printed and need not be subscribed at the foot of the memorandum, but must be made or adopted with the declared or apparent intent of authenticating the memorandum as that of the signer. Sec. 210 Restatement of the Law of Contracts, p. 287.

transmission of typewritten messages. No case in point has been called to the court's attention on this particular point, and a diligent search of the authorities has failed to uncover the status of teletype machines as satisfying the California Statute of Frauds. The point appears to be a res nova, but this court will hold that the teletype messages in this case satisfied the Statute of Frauds in California.

■■■ Was the deposit of $750.00 per car, agreed to be made by Joseph Denunzio and/or A. B. Rains, Jr., a condition precedent to recovery after notice of repudiation of the contract *by Raymond M. Crane and John C. Kazanjian?*

Joseph Denunzio had, by teletype message, dated October 3, 1944 (note 5), agreed to deposit $750 per car contingent upon receiving confirmation inspection reports, airmailed from California, that the grapes, grading U. S. No. 1, 28 pounds net, new display lugs, had been stored. In this teletype message of said date to Associated Fruit Distributors from A. B. Rains, Jr. (note 5), is this language: "They (meaning Joseph Denunzio) will put up the $750.00 deposits now of course contingent upon receiving inspct. Reports when stores" without any punctuation.

Counsel for Raymond M. Crane, in his contention that the $750 per car deposit was to be paid immediately by Joseph Denunzio and/or A. B. Rains, Jr., as a condition precedent to a recovery by Joseph Denunzio under the contract, undertakes, suppositionally, to place a comma after the word "now," so as to make the $750 per car deposit payable as of October 3, 1944, whereas counsel for Joseph Denunzio takes the position that "now" modifies "of course," and the "of course" modifies "contingent upon receiving inspection reports." (Reporter's transcript of the proceedings, pp. 38 and 39) With a comma placed after the word "now," if the court then adopted the construction claimed for the sentence by counsel for Raymond M. Crane, namely,

that the $750 per car deposit was to be made immediately, i. e., as of October 3, 1944, this construction would be inconsistent with and would do violence to the plain meaning of the rest of the sentence, namely, that the $750 deposit per car was subject to and contingent upon notice being received from Raymond M. Crane that the grapes had been stored, which notice, as the court understands the evidence, was never given to Joseph Denunzio and/or A. B. Rains, Jr. The sentence then would not make sense and it would be unintelligible if it intended to convey the impression that the $750 deposit per car was to be made now and at the same time be subject to, or contingent upon, the receipt by Joseph Denunzio and/or A. B. Rains, Jr., of notice that the grapes had been stored.

There is, of course, no punctuation to guide the court, but in view of the fact that the meaning is intelligible that the $750 deposit was clearly contingent upon A. B. Rains, Jr., and/or Joseph Denunzio receiving inspection reports when the grapes had been stored, which reports, as the court understands, were never forthcoming, the court adopts the construction placed upon this language by counsel for Joseph Denunzio.

Upon receiving notice on the part of John C. Kazanjian, or or about October 10, 1944 (note 9), and on the part of Raymond M. Crane on or about October 13, 1944 (note 10), that the contract was repudiated, Joseph Denunzio never did put up the $750 per car deposit. The question is: Was it still obligatory for him to make such deposit to avoid breaching the contract and excuse performance on the part of Crane and/or Kazanjian? The court thinks not, and concludes that no deposit was necessary under Sec. 1440 of the California Civil Code.[17]

*Damages;*

■■■ A repudiation of a contract or an anticipatory breach thereof does not accelerate the time fixed for performance, and

[17] Sec. 1440, Civil Code Cal.: When performance, etc. excused: "If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

130

the proper measure of damages is the same as if the breach had not occurred until the time fixed in the contract for its performance. Williston on Contracts, Secs. 1383, 1397.

The measure of damages is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract. California Civil Code, Sec. 1787.

In estimating damages, the value of property to a buyer deprived of its possession is deemed to be the price for which he might have bought an equivalent thing, in a market nearest to the place where the property should have been put into his possession, and at such time after the breach of duty upon which his right to damages is founded as would suffice, with reasonable diligence, for him to make such a purchase. California Civil Code, Sec. 3354.

■ Market value, for the purpose of calculating damages according to the statutory rules, is the sum for which similar merchandise could have been purchased at or near the place of delivery, and within a reasonable time after the seller's refusal to make delivery. 22 Cal.Jur. 1045, Sec. 108.

■ If the seller, previous to the time when the buyer rightfully demands delivery, gives notice of an intention not to deliver the merchandise, the measure of recovery is to be determined with reference to the market price at the time when delivery was due and not in respect of the price which prevailed at the date of notice of anticipatory breach.[18]

In this case counsel for Raymond M. Crane contends, however, that "when we (Crane and/or Kazanjian) notified them (Rains and/or Denunzio) that there would be no performance of this contract, it was his duty (Rains and/or Denunzio) to go out and secure grapes and he had no business waiting until December 10, (1944) before he secured them" (Reporter's transcript of proceedings, page 69). He cites the cases of Alaska Salmon Company v. Standard Box Company, 1910, 158 Cal. 567, 112 P.

454; Walker v. Harbor Business Blocks Company, 1919, 181 Cal. 773 (1919), 186 P. 356; and United States Trading Corporation v. Newmark Grain Company, 1922, 56 Cal.App. 176, 205 P. 29, 36. The latter case clearly supports the position of A. B. Rains, Jr., and/or Joseph Denunzio on the question of damages, namely:

"In measuring damages, the rule is that if, before the time when the buyer may rightfully demand delivery, the seller gives notice of an intention not to deliver, the market price as of the date when the delivery may rightfully be demanded by the buyer will govern, and not the market price on the date of such notice or anticipatory breach." (Cases cited)

The contract in the case under discussion was formed on October 3, 1944 (Note 6); the repudiation occurred on the part of John C. Kazanjian on or about October 10, 1944 (Note 9); and on the part of Raymond M. Crane, on or about October 13, 1944 (Note 10); actual delivery of the three cars of grapes was to have taken place on or about December 10, 1944; and the new purchases took place from third parties in which Joseph Denunzio was the purchaser, as follows: One car on December 20, 1944, one car on January 3, 1945, and the other car on January 22, 1945.

■ Under the law, Joseph Denunzio, in the purchase of these three cars of grapes to compensate for the three cars which Raymond M. Crane and/or John C. Kazanjian refused to ship under the breached contract, was not obliged to anticipate, at his peril, that the cost of grapes would be less prior to December 10, 1944 than afterward; in other words, that he could wait until delivery time and then purchase at the best price obtainable and recoup his loss by way of damages.

*Agency:*

The court having determined that there was a valid contract entered into between Raymond M. Crane and A. B. Rains, Jr., and the measure of damages, it is necessary, in order to fix liability, to ascertain:

---

[18] 22 Cal.Jur. 1048, Sec. 109; United States Trading Corporation v. Newmark Claim Company, 56 Cal.App. 176, 205 P. 29; Filice & Perrelli Canning Company, Inc. v. Walton, 95 Cal.App. 7, 271 P. 1096.

(1) The status of Joseph Denunzio Fruit Company, a corporation;

(2) The status of A. B. Rains, Jr.;

(3) The status of John C. Kazanjian, doing business as Red Lion Packing Company, and

(4) The status of Raymond M. Crane, doing business as Associated Fruit Distributors of California.

In determining the status of Raymond M. Crane it will likewise be necessary to decide if he was:

(1) Acting as a buying broker for A. B. Rains, Jr.,

(2) Acting as a principal in the sale of grapes to A. B. Rains, Jr., or

(3) Acting as an agent for his undisclosed principal, John C. Kazanjian, doing business as Red Lion Packing Company.

*Status of Joseph Denunzio Fruit Company:*

There is no dispute about the fact that A. B. Rains, Jr., acted exclusively as buying broker for his principal, Joseph Denunzio Fruit Co., in this transaction, at all times. The record is clear and convincing that during all the time the negotiations were carried on between Crane and Rains, the said Rains represented himself to be the buying broker for the Joseph Denunzio Fruit Company to Crane, and that Crane at all times understood that Rains was the buying broker for the Joseph Denunzio Fruit Company, and that said Company was the principal of Rains. (See Note 2 supra).

*Status of A. B. Rains, Jr.:*

In answer to interrogatories propounded by the Joseph Denunzio Fruit Company to A. B. Rains, Jr., the latter stated he had been a food broker in Louisville, Kentucky, for twenty-three years and had been acquainted with Joseph Denunzio and done business with him for twenty-three years; that he had been acquainted with said Raymond M. Crane for about five years, but that he was not acquainted with John C. Kazanjian, doing business as Red Lion Packing Company; and that during all of his dealings with Raymond M. Crane, the said Crane had acted as seller of fruit; that in all his dealing with the Associated

Fruit Distributors of California, his contracts had been made with said party, that payments had been made to Crane and invoices had been sent in the name of Raymond M. Crane and/or Associated Fruit Distributors of California.

A. B. Rains, Jr., further stated, in answer to interrogatories propounded by Joseph Denunzio Fruit Company, that when he received the telegram of September 26, 1944, from the Associated Fruit Distributors of California, he submitted the offer to Joseph Denunzio but was not advised that any shipper other than Raymond M. Crane would furnish the grapes; and that upon receipt of the telegram of October 2, 1944 (note 4), from the Associated Fruit Distributors, he was not advised that any shipper other than said Raymond M. Crane would furnish the grapes.

A. B. Rains, Jr., further testified, in response to said interrogatories, that when the Associated Fruit Distributors' second telegram to him of October 2, 1944 (?) (Note 6), mentioned the Red Lion Packing Company as shipper, this was in response to an order on behalf of Krotski Farms, and not on behalf of Joseph Denunzio Fruit Company; and that when he sent to Associated Fruit Distributors of California, his teletype message of October 3, 1944 (note 5) confirming for Joseph Denunzio Fruit Company the three cars of U. S. No. 1 Emperor grapes, he did not know that the Red Lion Packing Company would be the shipper, nor the shipper or grower who would supply the Associated Fruit Distributors of California with these grapes, and that he did not have this information when he prepared his Broker's Standard Memorandum of Sale of October 3, 1944, and sent a copy of it to the Associated Fruit Distributors of California.

The court is satisfied, from the evidence adduced, that throughout these transactions and negotiations between Crane and Rains, Rains acted exclusively as buying broker for the Joseph Denunzio Fruit Company, and believed Crane was acting as agent for an undisclosed principal, or in the most favorable light in which the court can place Crane, that he was acting as an agent for a partially disclosed principal.

*Status of John C. Kazanjian:*

 During the negotiations for the sale of these grapes between Crane and Rains, the evidence is clear that John C. Kazanjian took no part in the negotiations and did not know what terms were being offered at the time. The court is satisfied that although Rains knew, or had reason to believe, that Crane was acting for an undisclosed principal, subsequently partially disclosed (notes 6 or 9); he did not know the identity of John C. Kazanjian when he agreed to a procurement charge of $50 a car to be paid to Crane. Furthermore, there is evidence to show that when Crane was endeavoring to sell these grapes at the best price obtainable, to A. B. Rains, Jr., and other prospective purchasers on September 26, 1944 (note 1), John C. Kazanjian did not know who the prospective buyers might be. This is apparent from the telegrams of October 3, 1944,[19] and October 4, 1944.[20]

The court places John C. Kazanjian in the status of an undisclosed (or at best partially disclosed) principal, and for whom Raymond M. Crane purported to act without authority in this transaction, and for whose acts John C. Kazanjian cannot be held liable.[21]

*Status of Raymond M. Crane:*

In view of the contentions raised by counsel for Raymond M. Crane, it is necessary to determine whether he was (a) a buying broker or procuring agent for the Joseph Denunzio Fruit Company through broker A. B. Rains, Jr., (b) a principal, or (c) an agent for John C. Kazanjian. Most of these questions have been answered.

*Was Raymond M. Crane a buying broker for A. B. Rains, Jr?*

The Produce Reporter Blue Book, a publication followed by the produce industry, defines "buying brokers" as "special agents with authority to purchase,—limited to direct instructions from their principals, and to those incidental powers which are reasonable and necessary for the accomplishment of the object of the agency." While the Secretary of Agriculture has held a broker to be the agent of the seller, as the seller had agreed to pay the agent's brokerage (6 A.D. (Agriculture Decisions) 928), he has also held buying brokers to be agents for the purchasers[22]; but the court cannot

[19] Telegram dated Los Angeles, Oct. 3, 1944, to Red Lion Packing Co. Exeter, Calif., from Associated Fruit Distributors of California: "Referring telephone have sold for your account basis 2.50 lug net to you black emperors mentioned five cars basis 750.00 car deposit ten cars basis 1000.00 deposit to be paid upon receipt usone government inspections now depending you handle through us balance cars you mentioned for fresh shipment advise when expect ship these believe we could place them now ceiling price * * * price with deposits selling basis ability make usone grade suggest give us approximate shipping dates mays well get cleaned up since ceiling precludes any possibility higher market time of shipment will forward confirmations for your signature soons receive airmail from buyers."

[20] Telegram dated Oct. 4, 1944, to Associated Fruit Distributors "Fifteen cars storage U. S. one emperors december tenth conversion satisfactory at two dollars and fifty cents fob Exeter guaranty by buyer. One thousand dollars deposit on 10 cars and seven hundred fifty dollars on five cars said deposit to be paid immediately on inspection at shipping point, you to arrange for storage as agreed. Balance of pack intend to load after October twentieth. Will be glad to make deal on same about the 15th of Oct." (From John C. Kazanjian)

[21] Contracts unauthorized in part: Restatement of the law of agency, Sec. 164 (page 400) "If an agent, having the power to bind a disclosed or partially disclosed principal by certain terms in a contract, makes a contract including such terms and also other terms which are beyond the power which he has to bind the principal, the principal is not liable either upon the contract as made or the contract with the additional terms omitted."

[22] Adams & Dodge v. Joseph Martinelli & Co. 6 A.D. 1018, see also W. H. Russum v. Schowker Bros. & V. E. Turner, Jr., 6 A.D. 583, the latter of which cases cites Western Vegetable Distributors v. Sam Krasnow, PACA Docket 2312, S-1677, where the following statement is found: "It has been held repeatedly that where an offer is made by a buyer to a broker who transmits it to the seller, the buyer thereby makes the broker his agent, at least for the purpose of trans-

conclude that this was the position taken by Raymond M. Crane and A. B. Rains, Jr. The evidence is clear and convincing that during all the time these negotiations for the sale and purchase of the grapes were in progress between Crane and Rains, Rains was acting exclusively as the buyer's agent for Joseph Denunzio, and did not know that Crane was acting for an undisclosed principal, John C. Kazanjian, until the time of the repudiation of the contract by the Red Lion Packing Company, as principal, on October 10, 1944 (note 9), and by Crane on October 10, 1944, (note 10), or at the earliest, on October 3, 1944 (note 6).

Furthermore, Crane and Rains, instead of functioning in a fiduciary relationship, inter se, were at all times dealing with each other at arm's length, each attempting to make the best deal possible for his client; and for Raymond M. Crane to now take the position that he was the buying agent or broker for Joseph Denunzio through A. B. Rains, Jr., during the foregoing negotiations leading up to the consumation of this contract, is fantastic and taxes the credulity of the court. There is no creditable evidence in this case to support such a contention.

*Was Raymond M. Crane a principal?*

The court does not believe Crane was a principal during any of the times when negotiations were taking place between him and Rains, for a contract for the sale of the grapes, and Crane never represented himself to be a principal but an agent for an undisclosed principal, or a principal whose identity was partially disclosed. This is apparent from his telegram to Rains dated September 26, 1944 (Note 1), where the grapes are offered at $2.53 net to shipper, and where it is stated that the "shipper to trans title on or after December 10th, he (not me) paying all storage charges, etc., * * * we charging $50.00 per procurement charge." Also, in Raymond B. Crane's telegram of October 2, 1944, to A. B. Rains, Jr., he stated he had secured a revised deal (Note 4).

*Was Raymond M. Crane an agent for an undisclosed or a partially disclosed principal?*

At the trial before this court, the attorney representing Raymond M. Crane stated emphatically to the court that Crane at no time represented John C. Kazanjian as his agent, but was the buying agent for the Joseph Denunzio Fruit Company. (Reporter's transcript of proceedings, page 18) The court agrees with counsel that Crane at no time, in fact or in law, represented Kazanjian as his agent, for the evidence is clear and convincing that at no time did he have any authority from John C. Kazanjian to bind him to a contract with Joseph Denunzio and/or A. B. Rains, Jr., and it is for that reason that John C. Kazanjian is not liable for the unauthorized acts of Raymond M. Crane. However, the court concludes that, from the inception of the negotiations between Crane and Rains for the sale of the grapes, Crane led Joseph Denunzio to believe that he was a broker for an undisclosed, or partially disclosed, principal, subsequently developed to be John C. Kazanjian, and this is indicated, in addition to facts set out in Note 1, in Notes 6 or 9. There is a disagreement between counsel as to why the name of John C. Kazanjian was not mentioned as the selling principal in the Broker's Standard Memorandum of Sale, dated October 3, 1944, when Rains had, or should have had in his possession the teletype message of the Associated Fruit Distributors of California, dated October 3, 1944, mentioning Red Lion Packing Company as the seller (Note 6), but A. B. Rains, Jr., takes the position that the Red Lion Packing Company was mentioned there as a seller in connection with another deal in which the Joseph Denunzio Fruit Company was not a purchaser. An answer to this question

mitting such offer to the seller and receiving either an acceptance or rejection thereof."

See also 5 A.D. 646, where the Secretary stated: "The evidence indicates that the broker's services were paid by the respondent partnership. It is clear that the broker was the agent of the respondent."

See also Barker-Miller Distributing Co. v. Berman, D.C.1934, 8 F.Supp. 60. See also Channell Commercial Co. v. Hourihan, 20 Cal.App. 647, 129 P. 947.

would not carry much weight in arriving at a proper decision in this case.

*Agent personally liable when principal only partially disclosed.*

 If the other party (A. B. Rains, Jr.) has notice that the agent (Raymond M. Crane) is acting ·or may have acted for a principal (John C. Kazanjian), and has no notice of the principal's identity, the principal for whom the agent is acting is partially disclosed. A person purporting to make a contract with another for a partially disclosed principal is a party to the contract. If an agent discloses the fact that he is an agent, but not the name of the principal, he is personally liable.[23]

*Agent also personally liable when he assumes to act with authority from his principal:*

 On the theory that the Associated Fruit Distributors had sufficiently identified the shipper (John C. Kazanjian), they would likewise be liable by reason of the implied warranty that it had authority to act for Red Lion Packing Company when in fact it did not have such authority, and knew that it had not. A person who assumes to act as agent for another (in this case Crane for the Red Lion Packing Company) and to make a contract with a third party thereby, impliedly, if not expressly, represents that he is in fact authorized by his principal to make the contract, and if it proves to be unauthorized, the agent will be liable to the third party (in this case Joseph Denunzio).[24]

*Sales:.*

Raymond M. Crane, while he believed that the procurement charge of $50 a car was legal during the contract negotiations (note 10), took the position for the first time in this court that because he agreed to accept a procurement charge of $50 a car on each of the three cars of grapes sold, acceded to by A. B. Rains, Jr., in behalf of Joseph Denunzio, which concededly increased the cost thereof to·Joseph Denunzio over Maximum Price Regulation 426, issued pursuant to Title 50 U.S.C.A.Appendix, § 901, the contract became illegal and void ab initio; and, therefore, unenforceable as against the public policy. Counsel for Joseph Denunzio contended the evidence was inadmissible before this court because the point had not been presented to and ruled upon by the trial examiner and the Secretary of Agriculture.

 In appellate proceedings evidence aliunde or de hors the record is usually inadmissible and counsel are confined to the record in the court below, but under the statute under which this case is being appealed, *this is a trial de novo and therefore new evidence is admissible.*[25]

---

[23] Restatement of the Law of Agency, Sec. 4 (2) Sec. 321; Williston on Contracts, Sec. 285; Standard Livestock Company v. Pentz, 204 Cal. 618, 269 p. 645, 62 A.L.R. 1239; Pickands, Mather & Company v. H. A. & D. W. Kuhn & Company, 6 Cir., 8 F.2d 704; McKown v. Gettys & Gilbert, 25 Ky.Law Rep. 2070, 80 S.W. 169; Klinger v. Modesto· Fruit Company, 107 Cal.App. 97, 290 P. 127; Craig et al. v. Buckley et al., 218 Cal. 78, 21 P.2d 430.

Restatement of the law, Agency, Sec. ·321—principal partially disclosed. Unless otherwise agreed, a person purporting to make a contract with another for a partially disclosed principal is a party to the contract. Comment A principal is a partially disclosed principal when, at the time of making the contract in question, the other party thereto has notice that the agent is acting for a principal but has no notice of the principal's identity See Sec. 4. The fact that, to the

knowledge of the agent, the third person does not know the identity of the principal is of great weight in ascribing to the third person the intention to hold the agent liable either solely, or as a surety or copromisor with the principal. The inference of an understanding that the agent is a party to the contract exists unless the agent gives such complete information concerning the principal's identity that he can be readily distinguished.

[24] Mechem's Outline of Agency, Sec. 348; Williston on Contracts, Sec. 282; Kohlberg v. Havens, 41 Cal.App. 222, 182 P. 467; California Civil Code, § 2342; Borton v. Barnes, 48 Cal.App. 589, 192 P. 307.

[25] This chapter does not make proceeding in court thereunder one of review of the record made at reparation hearing nor confine either party to such record, but complainant may either stand on findings and orders of Secretary of

The court permitted both sides to file additional briefs on the illegality of contracts alleged to be contrary to public policy, and has considered the point raised, which is the most difficult one in the entire case. Raymond M. Crane, having been the prime mover in soliciting the procurement charge in the first instance, does not stand before the court in very good grace, for it is evident that the reason for the repudiation of the contract by Crane or by Kazanjian, was because the ceiling price on the grapes had been lifted in the meantime and they, or either of them, felt they could obtain a much higher price. This is manifest by the offer of Associated Fruit Distributors to A. B. Rains, Jr., in its telegram of October 10, 1944 (note 9), wherein it offered the grapes at $3.25 a lug, whereas, under the contract under the OPA ceiling, the price per lug quoted had been $2.50.

Counsel for Raymond M. Crane, in support of his contention that the contract is illegal, has cited to the court the Emergency Price Control Act of 1942, as amended, U.S.C.A. Title 50 Appendix, §§ 901(a), 902 and 904(a).

Sec. 904(a) provides as follows:

"It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, for any person to sell or deliver any commodity, or in the course of trade or business to buy or receive any commodity * * * or otherwise to do or omit to do any act, in violation of any regulation or order under section 2 (Section 902 of this Appendix) or of any price schedule effective in accordance with the provisions of section 206 (Sec. 926 of this appendix), or of any regulation, order, or requirement under section 202(b) or section 205(f) (Section 922(b) or 925(f) of this Appendix) or to offer, solicit, attempt, or agree to do any of the foregoing."

And he cites the case of Morgan Ice Co. v. Barfield, Texas Court of Civil Appeals, 1945, 190 S.W.2d 847, where a contract was held in violation of, and prohibited by, the Federal statutes and directives of the Office of Price Administration and, therefore, illegal and void.[26]

### The enforcement of OPA regulations calls for special penalties:

The enforcement of Maximum Price Regulation 426 calls for criminal penalties (a fine of not more than $5000 or imprisonment for not more than one year, or both, U.S.C.A. Title 50, App. § 925(b); Civil enforcement actions (injunctions by the Administrator, U.S.C.A., Title 50, App. § 925(a); suits for treble damages, U.S.C.A., Title 50, App. § 925(e); and proceedings for suspension of licenses, U.S.C.A. Title 50, App. § 925(f) (see section 9 MPR 426), but it is significant that the enforcement provision of 9 M.P.R. 426 *does not provide for voiding the contract,* either expressly or indirectly; and the court is of the opinion that this was an intentional omission, and that if Congress had intended a bonus or a procurement charge to an agent taking the cost of the product over ceiling to have vitiated any contract in its entirety in which it was provided for, it would have said so in specific language, for undoubtedly Congress was familiar with the custom and practice of commission merchants and brokers receiving commissions and brokerage fees for their services, which are collateral and incidental to the main contracts.

As very aptly expressed by counsel for Joseph Denunzio, "M.P.R. 426 (issued pursuant to the act) prohibits sales over ceiling prices. *It does not declare void any contract for the sale of any commodity over ceiling price.*" See sec. 7, M.P.R. 426, and "the enforcement provision of M.P.R. sec.

Agriculture or supplement them with other evidence. Smith v. White, D.C. Mo. 1942, 48 F.Supp. 554.

26 See also 12 Am.Jur. p. 652, et seq. relative to the general rule that an agreement which violates a provision of a Constitution or of a constitutional statute or which cannot be performed without violation of such a provision is illegal

and void; see also United States v. Lutz, 3 Cir., 1944, 142 F.2d 985; MacRae v. Heath, 60 Cal.App. 64, 212 P. 228, also Takeuchi v. Schmuck, 206 Cal. 782, 276 P. 345; Silverthorne v. Percey, 120 Cal.App. 83, 7 P.2d 746; Kings Laboratories v. Yucaipa Valley Fruit Co., 18 Cal.App.2d 47, 62 P.2d 1054.

426 does not provide for voiding the contract" "if the making of the contract calling for a price in excess of the maximum ceiling rendered the contract void, then it is void for all purposes and the purchaser could not sue to recover the overcharge or treble damages." (Denunzio's Brief p. 3)

*Statutes providing penalties without declaring Act Illegal or Void:*

With respect to statutes merely imposing a penalty on the doing of an act without either prohibiting it or expressly declaring it illegal or void, such as arises in this case, the principle of law is stated in 13 C.J. p. 422 (17 C.J.S., Contracts, § 202, page 558), as follows:

"[And] it would seem that in all cases the true rule is that the question is one of legislative intent, and the courts will look to the language of the statute, the subject matter of it, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment; and if from all these it is manifest that it was not intended to imply a prohibition or to render the prohibited act void, the courts will so hold and will construe the statute accordingly." (Cases cited)

See also: 6 Cal.Jur. 104, implication from imposition of penalty, and cases cited.

 The cases are clear that where a contract is against public policy it is illegal and void, in toto, and will not be enforced; but, in this case there is no contention made that the consent to a procurement charge was *malum per se*, and the court is here dealing with the doctrine of statutory construction.[27]

 *The specific problem in this case may be categorically formularized as follows: May an agent or broker, after having negotiated a contract in behalf of his principal, for the sale of a product to a third party, subject to the Emergency Price Control Act, wherein he asks for and the purchaser agrees that he may receive a bonus or procurement charge which, concededly, in itself brings the cost of the produce over the ceiling price, subsequently repudiate the contract in its entirety and have it declared illegal and unenforceable ab initio, as against public policy, solely because it provided for a bonus or a procurement charge over ceiling?*

Under California law, where a contract has several distinct objects, at least one of which is lawful, and one at least is unlawful, the contract is void as to the latter and valid as to the rest.

The court is of the opinion that it was not the legislative intent of Congress to avoid a contract because of a procurement charge to a third party, which was purely incidental and collateral to the main contract, such as the one before the court, but, assuming that counsel for Raymond M. Crane is correct in his contention that an *entire* and *inseparable* contract violating OPA ceiling prices would be illegal and unenforceable, in toto where one party was receiving the overcharge, it seems to the court that counsel loses sight of the fact that the contract here for the sale of grapes involved (1) Raymond M. Crane, acting in two different capacities (2) at least two different subject matters, and (3) two different and separate considerations, each for a particular and separate purpose. For the sale of the grapes—although the contract was made between Crane as agent for Kazanjian, and by Rains representing Denunzio—it was actually intended to be and was for the benefit of Kazanjian as seller, and Denunzio as buyer (both principals) and this portion of the contract (minus the procurement charge of $150) was complete in itself, perfectly legal, and within the OPA ceiling price, and supported by a separate con-

---

[27] "Where a violation of a licensing statute is merely malum prohibitum and does not endanger the public health or morals and where penalties for non-compliance are specifically set forth and no declaration that contract in relation thereto is void or its enforcement prohibited, such additional punishment should not be imposed unless legislative intent is expressed or appears by clear implication." Macco Const. Co. v. Farr, 9 Cir., 1943, 137 F.2d 52, 55.

"A statute containing prohibition and penalty makes act punished unlawful, and same may be implied from penalty without prohibition, but it does not follow that unlawfulness of act was meant to avoid contracts made in contravention of statute." Harris v. Runnels, 53 U.S. 79, 12 How. 79, 13 L.Ed. 901.

sideration: namely $2.50 per lug of grapes. The remaining part of the contract for the payment of a procurement charge of $50 a car, totaling $150, to Crane, was not for the benefit of Kazanjian but for the exclusive benefit of Raymond M. Crane as a principal, and not in the capacity of a broker, although for brokerage services, and, although contingent upon the execution of the contract of sale, was a separate consideration, namely the procurement charge of $50 per car for the execution and fulfillment of the contract of sale.

In the negotiations between Raymond M. Crane and A. B. Rains, Jr., for the sale of these grapes, Crane was acting in two capacities, i. e., for the sale of the grapes, at so much a lug, he was acting for Kazanjian and, in connection with his procurement charges, he was acting for himself personally, and the consideration for the cost of the grapes, and the consideration for his services were entirely separate and distinct considerations; in other words, the court is here dealing not with an entire inseparable contract, but with two separate contracts, and if the procurement charge can be eliminated from the contract and thereby bring the cost of the grapes under ceiling, the court sees no reason why the separable contract should be declared invalid, but only that portion of the contract providing for the procurement charge.

This contract, it is plain, had at least *two separate and distinct objects*: (1) The sale of the grapes, and (2) the payment of the procurement charge for their sale; and the consideration for each part was *separate* and *distinct,* the consideration for the sale of the grapes being $2.50 per lug, and the consideration for the execution of the contract being a $50 procurement charge per car. Because it was solely the addition of the procurement charge to the broker that increased the cost of the grapes over ceiling price, if it be assumed that this would render the entire contract illegal if allowed to stand, the court sees no reason why the procurement charge cannot be separated from the other part of the contract, admittedly legal otherwise, and only the procurement fee be declared illegal." [28]

The court, while it does not believe that the procurement charge in this case would render the entire contract illegal and unenforceable because of the penalties provided in the O.P.A. regulations for its violation, will, however, in view of the authorities in California permitting such action, declare only that part of the contract providing for the $150 procurement charge unenforceable, and permit the remaining part of the contract to stand as a legal and valid contract.

Although the contract in this case was made on October 3, 1944 (when there was a ceiling on the grapes), counsel for Joseph Denunzio takes the position that M.P.R. 426 (supra) would likewise be ineffective in this case for the reason that title to the grapes was not to pass until after December 10, 1944, at which time there was no ceiling thereon (the

---

[28] Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void. Civ. Code, Sec. 1598: Union Construction Co. v. Western Union Tel. Co., 163 Cal. 298, 125 P. 242. But it is both familiar and declared law that where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, the contract is void as to the latter and valid as to the rest (cases cited). The valid portion of a demand may be enforced where separable from that part which is void. Ede v. Knight, 93 Cal. 159, 28 P. 860; Doyle v. Tibbey, 82 Cal. 11, 22 P. 1128; Parker v. Reay,

76 Cal. 103, 18 P. 124 (these cases involved street assessments.) 6 Cal.Jur., Contracts, 149. "* * * but when part of the consideration is legal and part illegal and the transaction is of such a nature that the good part can be separated from that which is bad, the courts will make the distinction and allow the former to stand (cases cited) and where the contract contains two distinct stipulations, for each of which a separate consideration is expressed, and there is no reason to suppose that the expressed consideration for the one formed any part of the consideration for the other, the stipulation supported by the valid consideration will be enforced (cases cited). From 6 Cal. Jur. 194.

O.P.A. ceiling price on grapes having been removed on October 10, 1944), but the court is of the opinion that if this contract was invalid when made, its invalidity would not be removed by the lifting of the ceiling price on the grapes on October 10, 1944.[29]

*Party suing a principal and his agent is not compelled in the Federal District Court to elect whom he will hold liable in damages at the close of the evidence.*

Where a plaintiff institutes an action in the Federal district court against an agent and his principal on a contract made by the agent without disclosing his agency, will the plaintiff be compelled to elect whom he desires to hold liable at the close of the evidence, or may this question be kept open until the rendition of the judgment by the court? At the close of the evidence in this case both Crane and Kazanjian, through their respective counsel, moved the court to compel counsel for Denunzio Fruit Company to elect whom it would hold liable in damages, on the authority of, and citing, Klinger v. Modesto Fruit Company, Inc., 1930 107 Cal.App. 97, 290 P. 127; and Craig et al. v. Buckley, Jr., 1933, 218 Cal. 78, 21 P.2d 430, holding that in an action upon a contract made by an agent on behalf of an undisclosed principal, the creditor is not entitled to a judgment against both the principal and the agent when a demand for an election has been seasonably made; and that when the agency is established, on motion, the creditor will be required to designate which party he elects to hold responsible for the obligation.

See also Grosso v. Monfalcone, Inc., 1936, 13 Cal.App.2d 405, 56 P.2d 1266, to the effect that where one deals with another believing him to be a principal, and subsequently learns that he has been dealing with an agent of an undisclosed principal, he may recover either from the person with whom he dealt, or from the undisclosed principal, but he is not entitled to hold both the agent and the principal;

and, on demand therefor, the plaintiff must elect which he will hold. See also Restatement of the Law of Agency, Sec. 184, 209, 210, Vol. 1, and Sec. 337, Vol. 2. See also A.L.R., Vol. 118, Note on page 704, relative to the necessity and time for election to hold undisclosed principal. See also Fleming v. Dolfin, 214 Cal. 269, 4 P.2d 776, 78 A.L.R. 585. The above motions were not passed upon by the court, but were taken under submission by the court. Quaere: Was this an erroneous ruling by the court?

A further search of the authorities has brought to light the case of Johnson & Higgins v. Charles F. Garrigues Co., 2 Cir., 1929, 30 F.2d 251, 254, where the harshness of the rule of compelling an election is conceded as having the possibility of barring a just recovery. Judge Augustus N. Hand (dissenting in part) says:

" * * * I feel that the doctrine of election ought only to apply to a case where there has been both judgment and satisfaction, and that anything less than a complete satisfaction or an estoppel in pais affords no logical basis for barring a remedy against both agent and undisclosed principal, I must record my disagreement, even though it be a case of vox clamantis in deserto."

But see Tew v. Wolfsohn, 77 App.Div. 454, 456, 79 N.Y.S. 286, affirming 38 Misc. 54, 76 N.Y.S. 919, and affirmed 174 N.Y. 272, 66 N.E. 934 (from 2 C.J. p. 846, note 6, 3 C.J.S., Agency § 248) holding that:

"In an action against an agent and his principal on a contract made by the agent without disclosing his agency, there need be no election by plaintiff as to which party he will hold until the close of the case. And where the court said: 'The doctrine of election, in its general application, is inequitable and harsh, and it should not be applied to an action brought upon a contract made by an agent without disclosing his principal, until the debt has been satisfied by one or the other': Mc-Lean v. Sexton, 44 App.Div. 520, 523, 60

---

[29] Generally, a contract illegal when entered into does not become valid by a change in the law making such contracts legal, 17 C.J.S., Contracts, § 22, p. 355; Willcox v. Edwards, 162 Cal. 455, Ann. Cas.1913-c 1392; 123 P. 276; 12 American Jur. 660; 126 A.L.R. 685.

N.Y.S. 871 (where the court said: "There is no good reason why both the principal and agent who are liable for a debt should not be sued in the same action. Both will be discharged by the satisfaction of the debt, and neither can be discharged without it'); Dages v. Melrose Iron Co., 140 N.Y.S. 392."

There are certain fundamental and basic principles of law to guide this court in determining the correct rule to be followed for certainly, in justice, no litigant should be denied the fruits of a just judgment simply because, under the compulsion of the court he was held to an election, and, either through inadvertence or because of ignorance of the law, elected to hold the wrong party.

■ The first question for this court to consider is whether or not this point of election is a part of the substantive law of California or is purely a rule of procedure, for, if it is a part of the substantive law, and a federal question is not involved, there is no doubt that, in diversity of citizenship cases under the doctrine of Erie Railroad Company v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, the Federal district court is compelled to follow the decisions of the highest state courts in the state in which the Federal district court sits, as a rule of decision, not only in the construction of state statutes, but in the construction of the unwritten law as well.

However, in matters of procedure, since the abolition of the Conformity Act, 28 U.S.C. Sec. 724, wherein the Federal district courts followed the practice, pleadings, forms and modes of proceeding in civil causes, other than in equity or admiralty causes, and the adoption of their own rules of Federal Civil Procedure, 28 U.S.C.A. following section 723c, effective September 16, 1938, the Federal district courts, *in matters of procedure*, follow their own rules.

■ The court has concluded that the question of election is purely procedural and not substantive; and is, therefore, governed by the Federal Rules of Civil Procedure and not by the substantive laws of the state of California, in the absence of a ruling by the Circuit Court of Appeals of the Ninth Circuit to the contrary.

Rule 18 of the Federal Rules of Civil Procedure gives the plaintiff the right to join, either as independent or as alternate claims, as many as he may have against an opposite party, and there may be a like joinder of claims when there are multiple parties of the requirements of Rules 19, 20 and 22 are satisfied; and Rule 20 permits all persons to be joined in one action as defendants if there is asserted against them any right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, *and against one or more defendants accordingly to their respective liabilities*. (Italics supplied.)

For this court to have compelled the plaintiff to elect at the close of the evidence which party to hold liable in damages would not have conformed to any rule of Federal Civil Procedure effective since September 16, 1938 (a date subsequent to the decisions referred to, supra); and would have been directly contrary to the spirit thereof, these rules having been designed to "secure the just, speedy, and inexpensive determination of every action."

■ Assuming that the point under discussion is a procedural one, the plaintiff is entitled to an adjudication of its claims against both the agent and the principal under the italicized portion of Rule 20, supra, which it would not obtain if it were compelled to make an election at the close of the evidence, although a full recovery against one bars a recovery against the other. Furthermore, to compel a plaintiff to elect which party defendant it desires to hold liable is tantamount to compelling him to dismiss against the other defendant prior to the court's adjudication as to the liability of the parties.

■■ Assuming that the point under discussion is one of substantive law, it is believed that this court would not be bound

*in this case* by the decisions of the three California cases, supra, *as rules of decision,* under the doctrine of Erie Railroad Company v. Tompkins, supra, as it would be in a diversity of citizenship case, for here a federal question is involved, namely, an appeal from the ruling of the Secretary of Agriculture under a federal statute, and the Federal courts are entitled to decide these questions for themselves where the case involves a federal question, a federal question and contract right, or a question with respect to the Constitution of the United States. 25 C.J., Federal Courts, page 837. See also Vol. 35, C.J.S. Federal Courts, § 169, page 1243, and cases cited, to the effect that where a federal question is involved the Federal courts administer the national law, as established by the Federal Constitution, treaties, and statutes, regardless of state law.

*Conclusion:*

Counsel for Raymond M. Crane has called the court's attention to the fact that all the profit Crane could possibly have realized from the performance of this contract would have been a procurement charge of $50 for each of the three cars of grapes, or a total of $150 less his expenses, and has contended that it would be unfair to compel him to respond in damages to the extent of $5,723.50, with interest (increased also by attorney fees and costs allowed to counsel for Joseph Denunzio under the statute); but, while this court is sympathetic to the predicament in which he has placed himself, this is a law action where all sides are entitled to stand upon their contract rights and legal remedies, and the court has no alternative but to interpret the contract as it believes it should be interpreted according to legal principles involved.

The findings of fact and conclusions of law, and the order or award of the Secretary of Agriculture have been made a part of the record in this case and are prima facie evidence of the facts therein stated, 7 U.S.C.A. § 499g (c); and, the findings and order of the Secretary will prevail unless overcome by evidence submitted by the Associated Fruit Distributors. Barker-Miller Distributing Company v. Berman, D.C.N.Y., 8 F.Supp. 60; Spano v. Western Fruit Growers, 10 Cir., 83 F.2d 150; Smith v. White, D.C., 48 F.Supp. 554.

The court has duly considered the facts and the law governing this case and has independently come to the same conclusions reached by the Secretary of Agriculture and his trial examiner. The reparation order or award of the Secretary of Agriculture issued April 8, 1947, affirming the prior order or award of the Board, dated February 26, 1947 in favor of Joseph Denunzio Fruit Company, a corporation, against Raymond M. Crane, doing business as Associated Fruit Distributors of California, and dismissing the case against John C. Kazanjian, doing business as Red Lion Packing Company, is affirmed.

In view of the ruling of this court, on the procedural point in the matter of election, if counsel for Joseph Denunzio deems it advisable to do so, he is hereby given permission to make an election, in writing, and prior to the entry of the judgment, as to which respondent he desires to hold liable in damages in this case.

The complainant and appellee, Joseph Denunzio Fruit Company, a corporation, will be allowed a reasonable attorney fee against respondent and appellant, Raymond M. Crane, doing business as Associated Fruit Distributors of California, to be taxed and collected as a part of its costs, pursuant to Sec. 499g (c) of Title 7 U.S.C.A., in the sum of $3000.

Counsel for said complainant and appellee, Joseph Denunzio Fruit Company, a corporation, will prepare Findings of Fact and Conclusions of Law, and a Judgment in accordance therewith to conform to this court's opinion for signature of the court within fifteen days after notice of this ruling, as provided by local rule of court.