### CENTRAL FRUIT & VEGETABLE CO. et al. v. CRANE et al.

No. 12884.

United States Court of Appeals Ninth Circuit.

Sept. 2, 1952.

Rehearing Denied Oct. 16, 1952.

---

**4.** See Trial Court's memorandum re final judgment, 100 F.Supp. 338.

Harry A. Pines, Los Angeles, Cal., J. Manuel Hoppenstein, Dallas, Tex., for appellants.

Henry O. Wackerbarth, Los Angeles, Cal., for appellee Crane.

G. L. Aynesworth, L. Nelson Hayhurst, Wallace G. Quinlisk, Fresno, Cal., for appellee Kazanjian.

Before MATHEWS and STEPHENS, Circuit Judges, and McCORMICK, District Judge.

MATHEWS, Circuit Judge.

At all pertinent times, Central Fruit & Vegetable Company, hereafter called Central, was a partnership doing business at Dallas, Texas; West Texas Produce Company, hereafter called West, was a partnership doing business at Forth Worth, Texas; Raymond M. Crane was an individual doing business as Associated Fruit Distributors at Los Angeles, California, and was a broker, within the meaning of the Perishable Agricultural Commodities Act, 7 U.S.C.A. § 499a et seq.;[1] and John C. Kazanjian was an individual doing business as Red Lion Packing Company at Exeter, California, and was a dealer, within the meaning of the Act.[2]

Central and West filed with the Secretary of Agriculture an "informal" complaint on October 21, 1944, and a "formal" complaint on January 22, 1946, against Crane and Kazanjian, based on §§ 2 and 5–7 of the Act, 7 U.S.C.A. §§ 499b, 499e–499g. The "formal" complaint, hereafter called the complaint, alleged, in substance, that Crane and Kazanjian had, on or about October 3, 1944, contracted to sell to Central and West, on or after December 10, 1944, 10 carloads, hereafter called cars, of U. S. No. 1 Emperor grapes,[3] to be placed in storage by Kazanjian in October, 1944—4 cars to Central and 6 cars to West—all of which were to be shipped from California to Texas, and that Crane and Kazanjian had failed to deliver any grapes to Central and West, or either of them, and, by such failure, had violated § 2 of the Act, 7 U.S.C.A. § 499b, and damaged Central and West in sums aggregating $16,575. The complaint prayed for an order awarding Central and West "such amount of damages as they [might] be entitled to receive."

Pursuant to subsection (c) of § 6 of the Act, 7 U.S.C.A. § 499f, the complaint was served on, and answers were filed by, Crane and Kazanjian, and a hearing was held before a duly authorized examiner of the Secretary in the Southern District of California—the district in which Crane and Kazanjian did business. Thereafter, on April 23, 1948, pursuant to subsection (a) of § 7 of the Act, 7 U.S.C.A. § 499g, the Secretary[4] rendered a decision, stating therein his findings and conclusions, and made and entered a reparation order directing Kazanjian to pay as damages, on or before May 23, 1948, $6,133.25 to Central and $10,112.16 to West, with 5% interest on each amount from December 10, 1944, and dismissing the complaint as to Crane. From that order Kazanjian appealed on May 21, 1948, to the United States District Court for the Southern District of California, pursuant to subsection (c) of § 7.

As required by that subsection, the District Court treated the case as a civil action for damages and tried it de novo. Thereafter the District Court stated its findings and conclusions and entered a judgment dismissing the action, thus, in effect, affirming that part of the order which dismissed the complaint as to Crane and reversing that part of the order which required Kazanjian to pay damages to Central and West. From that judgment Central and West have appealed to this court.

Central and West were adversely affected by that part of the order which dismissed the complaint as to Crane. There-

---

1. See definition in paragraph (7) of § 1 of the Act, 7 U.S.C.A. § 499a.

2. See definition in paragraph (6) of § 1.

3. Grapes of the U. S. No. 1 grade and of the Emperor variety.

4. Acting by and through an officer designated by him. See 5 U.S.C.A. §§ 516a–516e.

fore Central and West could have appealed to the District Court,[5] but they did not. By not appealing to the District Court, they acquiesced in, and waived their right to complain of, that part of the order which dismissed the complaint as to Crane. Therefore they cannot be heard to complain of that part of the judgment which affirmed that part of the order. Therefore that part of the judgment is presumed to be correct.

There remains for review that part of the judgment which reversed that part of the order which required Kazanjian to pay damages to Central and West.

As indicated above, the ground on which damages were claimed of Kazanjian was that he contracted to sell 10 cars of grapes to Central and West and failed to deliver them. Kazanjian denied that he contracted to sell any grapes to Central and West. Central and West did not claim that they and Kazanjian dealt with each other directly, but claimed that Crane, for Kazanjian's account, and Jay Margules,[6] for Central and West's account, made a contract whereby Crane, for Kazanjian's account, contracted to sell to Central and West, on or after December 10, 1944, 10 cars of U. S. No. 1 Emperor grapes, to be placed in storage by Kazanjian in October, 1944—4 cars to Central and 6 cars to West—and that Kazanjian authorized Crane to make the contract and confirmed it after it was made; all of which Kazanjian denied. Thus, in effect, Central and West claimed, and Kazanjian denied, that Kazanjian, acting by and through Crane, contracted to sell the 10 cars of grapes to Central and West.

There was evidence to the following effect:

At all pertinent times, Kazanjian was engaged in the business of selling grapes. During grape seasons prior to 1944, Crane was Kazanjian's broker and, as such, sold grapes for Kazanjian's account. On or shortly before September 26, 1944, Crane and Kazanjian had a conversation wherein Kazanjian refused to employ Crane as Kazanjian's broker for the 1944 grape season, because ceiling prices for grapes had been established under the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq., the demand for grapes at ceiling prices exceeded the supply, and Kazanjian therefore did not need a broker.

After that conversation, Crane sent Margules three telegrams—one on September 26, 1944, and two on October 2, 1944[7] —but Kazanjian did not authorize Crane to send any of those telegrams, did not read or see any of them and was not bound by any of them.

On October 2, 1944, Crane and Kazanjian had a telephone conversation wherein Crane stated, in substance, that he had found buyers (not named or identified) who were willing to make contracts with Kazanjian, whereby the buyers would contract to buy from Kazanjian, and Kazanjian would contract to sell to the buyers, on or after December 10, 1944, 15 cars of U. S. No. 1 Emperor grapes, to be placed in storage by Kazanjian in October, 1944, and that, if Kazanjian would make such contracts, Crane would arrange for storage of the grapes; and Kazanjian stated, in substance, that he was willing to make such contracts on terms which he specified in that conversation,[8] but Kazanjian did not authorize Crane to make any contract or any sale for Kazanjian's account.

5. See subsection (c) of § 7 of the Act, 7 U.S.C.A. § 499g.

6. A broker doing business as Southwest Brokerage Company at Dallas, Texas.

7. Crane's telegram of September 26, 1944, and his second telegram of October 2, 1944, were called night letters.

8. The terms so specified were, in part, as follows: Crane to arrange for storage of the grapes; the grapes to be sold and delivered to the buyers, F.O.B. Exeter, California, on or after December 10, 1944;

title to the grapes to be transferred to the buyers upon such delivery; the price of the grapes to be $2.50 per lug, net to Kazanjian; the buyers to deposit with Kazanjian, upon inspection of the grapes and as a partial payment therefor, $750 per car for 5 of the 15 cars and $1,000 per car for 10 of the 15 cars; the balance of the purchase price of each car of grapes to be paid upon delivery, F.O.B. Exeter; all deposits and payments to be made in cash to Kazanjian at Exeter before shipment or removal of the grapes from Exeter.

On October 3, 1944, Margules signed a memorandum entitled "Standard Memorandum of Sale" and sent a copy to Central, a copy to West and a copy to Crane, but none to Kazanjian. Kazanjian did not sign the memorandum, did not authorize anyone to sign it, did not receive, read or see it and was not bound by it.

On October 3, 1944, Crane sent Kazanjian the following telegram: "REFERRING TELEPHONE HAVE SOLD FOR YOUR ACCOUNT BASIS 2.50 LUG NET TO YOU BLOCK EMPERORS MENTIONED FIVE CARS BASIS 750.00 CAR DEPOSIT TEN CARS BASIS 1000.00 DEPOSIT TO BE PAID UPON RECEIPT US ONE GOVERNMENT INSPECTIONS * * * WILL FORWARD CONFIRMATIONS FOR YOUR SIGNATURE SOONS RECEIVE AIR-MAIL FROM BUYERS."

That telegram was intended by Crane and understood by Kazanjian to mean that, subject to confirmation, Crane, for Kazanjian's account, had made contracts with buyers (not named or identified), whereby the buyers had contracted to buy from Kazanjian, and Crane, for Kazanjian's account, had contracted to sell to the buyers, on or after December 10, 1944, the 15 cars of grapes mentioned in the telephone conversation of October 2, 1944; that the contracts so made by Crane for Kazanjian's account were made on the terms specified by Kazanjian in that conversation;[9] and that confirmations thereof would be signed by the buyers, sent by them to Crane and forwarded by Crane to Kazanjian for Kazanjian's signature.[10]

On October 4, 1944, Kazanjian sent Crane the following telegram: "FIFTEEN CARS STORAGE US ONE EMPORERORS DECEMBER 10TH CONVERSION SATISFACTORY AT TWO DOLLARS AND FIFTY CENTS FOB EXETER GUARTY BY BUYER. ONE THOUSAND DOLLARS DEPOSIT ON 10 CARS AND SEVEN HUNDRED FIFTY DOLLARS ON FIVE CARS SAID DEPOSIT TO BE PAID IMMEDIATELY ON INSPECTION AT SHIPPING POINT. YOU TO ARRANGE FOR STORAGE AS AGREED * * *"

That telegram was intended by Kazanjian and understood by Crane to mean that Kazanjian was still willing to make contracts with buyers (not named or identified), whereby the buyers would contract to buy from Kazanjian, and Kazanjian would contract to sell to the buyers, on or after December 10, 1944, the 15 cars of grapes mentioned in the telephone conversation of October 2, 1944, on the terms specified by Kazanjian in that conversation.

Kazanjian did not, by that telegram, authorize Crane to make any contract, nor did Kazanjian by that telegram, confirm or ratify any contract. See Joseph Denunzio Fruit Co. v. Crane, D.C.S.D.Cal., 79 F.Supp. 117; Id., D.C.S.D.Cal., 89 F.Supp. 962; Id., 9 Cir., 188 F.2d 569.[11]

9. Actually, Crane had not made, and never did make, any contract on the terms specified by Kazanjian in that conversation.

10. Actually, no confirmation was ever forwarded to or received or signed by Kazanjian.

11. Joseph Denunzio Fruit Company, hereafter called Denunzio, filed with the Secretary of Agriculture a complaint against Crane and Kazanjian, alleging that Crane and Kazanjian had contracted to sell three cars of grapes to Denunzio and had failed to deliver them. Crane and Kazanjian denied that they had contracted to sell the grapes to Denunzio. That the grapes were not delivered was admitted.

The evidence showed that Crane, purportedly acting for an undisclosed principal, had contracted to sell the grapes to Denunzio and, after making the contract with Denunzio, had represented to Denunzio that Kazanjian was his principal. To show that Kazanjian had authorized Crane to make the contract with Denunzio and had confirmed it, the above quoted telegrams were put in evidence.

Despite these telegrams, the Secretary found that Kazanjian had not authorized Crane to make the contract with Denunzio and had not confirmed it. Accordingly, the Secretary made an order requiring Crane to pay damages to Denunzio and dismissing the complaint as to Kazanjian.

Crane appealed to the District Court. The District Court (Judge J. F. T. O'Connor presiding) tried the case de novo and rendered a decision which, in

Central and West were not mentioned or referred to in Crane's telegram to Kazanjian or in Kazanjian's telegram to Crane. Kazanjian never made any contract with Central and West or either of them. If Crane made any such contract, he made it without Kazanjian's authorization. No such contract was ever confirmed or ratified by Kazanjian.

From the evidence briefly summarized above, the District Court found that Kazanjian did not contract to sell any grapes to Central and West or either of them. The finding was not clearly erroneous. We therefore accept it as correct. See Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Judgment affirmed.

effect, affirmed the Secretary's order. Joseph Denunzio Fruit Co. v. Crane, D.C. S.D.Cal., 79 F.Supp. 117.

Crane moved for a new trial. Judge O'Connor died before the motion could be heard. After Judge O'Connor's death, the District Court (Judge James M. Carter presiding) granted the motion, retried the case and rendered a decision which, in effect, dismissed the complaint as to both defendants. Joseph Denunzio Fruit Co. v. Crane, D.C.S.D.Cal., 89 F.Supp. 962.

Denunzio appealed to this court. This court reversed Judge Carter's decision and reinstated Judge O'Connor's decision. Joseph Denunzio Fruit Co. v. Crane, 9 Cir., 188 F.2d 569. Thereby this court, in effect, approved the Secretary's finding that Kazanjian had not authorized Crane to make the contract with Denunzio and had not confirmed it—a finding which Judge O'Connor had theretofore approved and Judge Carter had neither approved nor disapproved.

It should be noted that the Secretary, Judge O'Connor, Judge Carter and this court agreed that Denunzio was not entitled to recover damages of Kazanjian.