367 F.2d 907
 Fred A. BROWN and Jennie B. Brown, d/b/a Gem Dairy, Appellants,
v.
UNITED STATES of America, and Orville L. Freeman, Secretary of Agriculture, Appellees.
UNITED STATES of America, Appellant,
v.
Fred A. BROWN and Jennie B. Brown, d/b/a Gem Dairy, Appellees.
 No. 8291.
 No. 8292.
 United States Court of Appeals Tenth Circuit.
 October 27, 1966.
 Rehearing Denied December 6, 1966.
 
 George Louis Creamer, Denver, Colo. (Nathan H. Creamer, Denver, Colo., with him on the brief), for appellants Fred A. Brown, and others.
 Frederick B. Abramson, Atty., Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Washington, D. C., and Lawrence M. Henry, U. S. Atty., Denver, Colo., with him on the brief), for appellees United States, and Orville L. Freeman.
 Before PICKETT and HICKEY, Circuit Judges, and CHRISTENSEN, District Judge.
 PICKETT, Circuit Judge.
 
 
 1
 On November 1, 1961, the Secretary of Agriculture, acting pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., promulgated Milk Marketing Order No. 137 for the Eastern Colorado Marketing Area. 7 C.F.R. 1137.1, et seq. The purpose of the Order was to equalize and stabilize the price to be paid for milk produced within the area, regardless of the use of the milk by the purchasers, or "handlers." As all handlers within the terms of the Order were required to pay a minimum price for purchased milk, the Secretary, in order to prevent inequities, was authorized to provide a means for equitable adjustment of payments, whereby each handler would pay for the milk according to the use made thereof. (7 U.S.C. § 608c(4)). The most workable method of equalizing the price was found to be a "producers-settlement fund." A Market Administrator, designated by the Secretary, was required to determine a "blend price", taking into consideration the different uses of milk within the area. Milk sold for fluid consumption brought the highest price. A lesser value was established for the milk used in the manufacture of cottage cheese, powdered milk, butter, ice cream and other manufactured milk products. All handlers paid the milk producers the blend price for milk, regardless of its use. Those handlers whose use of milk called for a price above the fixed blend price were required to contribute to the producer-settlement fund accordingly. Those whose use resulted in a price below the blend price were paid the difference from the fund.[1] The reliance of the industry upon this fund makes prompt payments into it imperative. United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290. The theory of the Order is that all milk produced in the area, not specifically exempt, is considered to be in a "pool" from which handlers draw for varied uses. In final settlement, the cost of milk to handlers depends upon its use. In this arrangement, the price difference according to use is the essence of the plan to stabilize prices to producers within a designated area through a uniform minimum price.
 
 
 2
 The appellants, Fred A. Brown and Jennie B. Brown, d/b/a Gem Dairy in Denver, Colorado, were distributors of milk for fluid consumption within the area, and, claiming that they were not "handlers" as defined by the Order, refused to comply therewith. The United States sought a mandatory injunction to enforce compliance with the Order. The matter was held in abeyance pending an administrative appeal to the Secretary of Agriculture from the Market Administrator's determination that Gem was a "handler", and therefore subject to the provisions of the Order. The Secretary, acting through his Judicial Officer, entered an order adverse to Gem. Gem thereupon instituted an action for review in the United States District Court for the District of Colorado, 7 U.S.C. § 608c (15), and the cases were consolidated for trial. Judgment was entered for the amount of delinquent payments due the stabilization fund, but injunctive relief was denied. Gem appealed from the judgment, and the United States appealed from the refusal to grant the injunctive relief prayed for. We shall dispose of both cases in one opinion.
 
 
 3
 Throughout the proceedings, Gem has maintained that it is a "producer-handler" of milk and therefore exempt from the requirements of the Order.[2] We agree with the Secretary of Agriculture and the trial court that this contention is not sustained by the record. Prior to notice that Milk Marketing Order 137 would be proposed, Gem was purchasing all of its milk from six farmer-producers in the Denver area for the purpose of processing and delivering in fluid form to its customers. After the Order had been proposed and a hearing held thereon, Gem entered into contracts with all of these producers, whereby, for the sum of $15.00 per animal, a 1/10th interest was acquired in all of the dairy cattle from which the milk was produced. The contracts also provided that Gem was the owner of all milk produced from these cows, for which it was required to pay the current milk price. With few exceptions, the current price was the "blend price" as established by the Market Administrator. Gem assumed no control over the management or care of the dairy cows, and the $15.00 payment was to be returned if any of the animals were sold, regardless of the sale price. Either party was free to discontinue this arrangement by giving 30 days notice, in which event the $15.00 per head was to be returned to Gem. It is clear that Gem was not operating the dairy farms in question, nor was the care and management of the dairy animals part of its enterprise. The contracts brought about no change whatsoever in Gem's method of doing business, and excepting the $15.00 payment, no additional obligations were incurred.[3] As between the parties, the district court decision does not affect the validity of these contracts; it merely holds that they are not effective to classify Gem a "producer-handler" as defined in the Order.
 
 
 4
 Gem argues that it was denied constitutional due process when the Market Administrator determined without a hearing that it was a "handler" within the meaning of the Order. The Act provides, however, that a handler is entitled to a hearing before the Secretary after the Market Administrator's decision is made. It is sufficient to satisfy the demands of due process if a hearing is provided for before a final order becomes effective. Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694; Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624. In United States v. Rozicka, supra, the court refers to the safeguards provided by opportunity for administrative and judicial consideration of a handler's grievances. We are satisfied that there was no lack of due process in the classification of Gem as a handler.
 
 
 5
 The administrative hearings were held before an Examiner, and the final order made by a Judicial Officer of the Department of Agriculture. Gem contends that the determination is void because it was not made by the Secretary, and that the powers of the Secretary could not properly be delegated to the Judicial Officer. No contention is made that the Secretary of Agriculture did not designate the Judicial Officer to act in this case by appropriate order. See, 10 F.R. 13769; 27 F.R. 8288. Rather, it is argued that only the Secretary has the power to review objections to specific rulings in proceedings such as under consideration here. The provisions of 5 U.S.C. §§ 516a, 516b, and 516c, however, authorize the Secretary of Agriculture to delegate to the Judicial Officer authority to perform those regulatory functions which were undertaken in this proceeding. See, Central Fruit & Vegetable Co. v. Crane, 9 Cir., 198 F.2d 808, cert. denied 344 U.S. 921, 73 S.Ct. 387, 97 L. Ed. 709; Denver Union Stock Yard v. Livestock Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed.2d 771; Ideal Farms, Inc. v. Benson, 3 Cir., 288 F.2d 608, cert. denied 372 U.S. 965, 83 S.Ct. 1087, 10 L. Ed.2d 128; Wilson & Co. v. Benson, 7 Cir., 286 F.2d 891.
 
 
 6
 In the administrative proceedings, it was found that Gem was delinquent in its payments into the stabilization fund in the amount of $13,066.39 as of the date of the hearing. The trial court entered judgment against Gem for that amount. It is urged that the judgment is void because the court relied entirely upon the record in the administrative proceedings and that there was no evidence in the record from which the amount of the judgment could be computed. We think the evidence in the administrative proceedings and before the trial court was sufficient to sustain the finding as to the amount due. Although Gem refused to make payments into the stabilization fund as required by the Order, it did submit to the Market Administrator the required reports which showed the amount of milk handled by it and the uses for which it was sold. Gem was furnished monthly bulletins as to the blend price to be paid for the milk and the value of the milk received by it. The determination of Gem's obligation to the stabilization fund was a matter of mathematical computation. At the administrative hearing, the Market Administrator fully explained the manner by which the amounts due from Gem were determined. In addition, when the matter came before the district court, the Market Administrator, at the request of the court, furnished an affidavit which explained in detail how these charges were computed. When Gem objected to the procedure for the determination of the amount due, the court suggested that the parties confer for the purpose of satisfying Gem as to how the Administrator had computed the amount of the delinquency. At a later hearing, the court observed:
 
 
 7
 "The Court: So, my disposition would be to direct the entry of judgment for all those contributions that had accumulated up to that point, it appearing that the method employed is in accordance with the regulations, and that the calculations are not improper.
 
 
 8
 Mr. Creamer has very candidly stated to the Court that the accountant has not found any impropriety in these calculations. This I appreciate. In view of that, it seems to me that we have found the truth to the extent that we are going to."
 
 
 9
 We perceive no judicial error in the determination of the amount due.
 
 
 10
 As to the right of the Secretary to a mandatory injunction requiring compliance with the Order, we think that the district court, upon finding that Gem was in continuous violation of the Order, was required to grant the relief sought. 7 U.S.C. § 608a(6) provides:
 
 
 11
 "The several district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating any order, regulation, or agreement, heretofore or hereafter made or issued pursuant to this chapter, in any proceeding now pending or hereafter brought in said courts."
 
 
 12
 The Act authorizes a handler to challenge, in administrative proceedings, an order which is "not in accordance with the law." 7 U.S.C. § 608c(15) (A). The jurisdiction of district courts are limited to a determination of whether the ruling of the Secretary in the administrative proceedings is "in accordance with law." 7 U.S.C. § 608c(15) (B). If the order is found to be in accordance with law, the district court is "vested with jurisdiction specifically to enforce." As said in United States v. Ruzicka, supra, 329 U.S. at 292, 67 S.Ct. at 209-210:
 
 
 13
 "Sections 8a(6) and 8c(15) thus form a complementary procedural scheme. Contrariwise, it would make for disharmony to extrapolate from these provisions of the statute the right to consider independently, in a proceeding by the Government for the enforcement of the Secretary's order, questions for which Congress explicitly furnished the handler an expert forum for contest with ultimate review by a district court.
 
 
 14
 The situation before us indicates how disruptive it would be to allow issues that may properly come before a district court in a proceeding under § 8c(15) to be open for independent adjudication in a suit for enforcement under § 8a(6). After a presumably careful study by those technically equipped, a program was devised for the dairy farmers in one of the large areas of the country. The success of the operation of such Congressionally authorized milk control must depend on the efficiency of its administration. Promptness of compliance by those subject to the scheme is the presupposition of Order No. 41. Thus, definite monthly deadlines are fixed by the Order for every step in the program."
 
 
 15
 The success of the plan of the Order depends upon the prompt compliance of those subject to its provisions, including prompt payment of the financial obligations. Gem has never made any payments into the stabilization fund, and, without enforcement relief, the Secretary can only sue periodically to recover delinquent payments, thereby disrupting the entire plan. We think the statute clearly contemplates that the Secretary is entitled to an injunction commanding compliance with the Order by one who has been in continuous violation.[4] United States v. Turner Dairy Co., 7 Cir., 162 F.2d 425, cert. denied 332 U.S. 836, 68 S.Ct. 219, 92 L.Ed. 409; United States v. Yadkin Valley Dairy Cooperative, Inc., U.S.D.C., N.C., M.D., 209 F.Supp. 634, aff'd 315 F.2d 867.
 
 
 16
 The judgment is affirmed, except the denial of injunctive relief. The case is remanded with instructions to grant the injunction prayed for.
 
 
 
 Notes:
 
 
 [1]
 In an early case after the constitutionality of the statute had been upheld, (United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, rehearing denied 308 U.S. 631, 60 S.Ct. 66, 84 L.Ed. 526; H. P. Hood & Sons v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478), Judge Magruder described the method of equalizing and stabilizing the price of milk through an order similar to the one under consideration here, as follows: "Article III of the Order sets up classifications of milk according to the use to which it is put, because such use primarily determines the market value of the milk. Class I embraces fluid milk disposed of for consumption in that form as an article of diet. Class II embraces milk disposed of for non-fluid purposes, such as the manufacture of butter or ice cream. Article IV establishes minimum prices to be paid by handlers of Class I and Class II milk, respectively. While in the net result these prices are paid by handlers for the milk that they buy and dispose of, the individual producers do not receive payment on this basis. The Order creates a market-wide pool as an equalization device under which the individual producer is paid a uniform composit price for the milk which he sells, based upon the use made of all the milk sold in the Greater Boston Marketing Area. A Market Administrator computes for each delivery period the use value of the milk sold or used by each handler, multiplying the quantity of such milk in each class by the applicable class price and adding together the two sums (Art. VII, Sec. 1). Then the Administrator combines into one grand total the respective values of the milk sold or used by each handler, and after adjustments for various differentials the adjusted total is divided by the total quantity of milk. The result is a `blended' or uniform price which all producers are to receive for milk delivered by them during the period, regardless of the use to which any particular milk is devoted
 The blended price is less than the Class I price and more than the Class II price as fixed by Article IV of the Order. A handler who has more than the market average of Class II milk sales during a particular delivery period will have to pay to his producers at the blended price an amount greater than the total amount charged to him as the use value of the milk he has received from producers during that period. Such a handler will therefore be credited with the difference in his producer settlement account on the books of the Market Administrator and becomes entitled to receive from the Administrator an equalization payment out of the pool. On the other hand, a handler who has more than the market average of Class I fluid milk sales during the same delivery period will pay to his producers at the blended price an amount less than the total amount charged to him as the use value of the milk he has received from producers during the period. Such a handler will therefore be debited with the difference in his producer settlement account, and is required by Article VIII, Section 1, of the Order to pay this amount into the pool. Omitting refinements, the debits and credits in the pool should normally balance out in each delivery period.
 This market-wide equalization pool is the core of the regulatory scheme set up by Order No. 4 as amended." Green Valley Creamery v. United States, 1 Cir., 108 F.2d 342, 343-344. See, also, United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290.
 
 
 [2]
 The Order defines "producer-handler" as follows:
 "`Producer-handler' means any person who operates a dairy farm and a milk processing plant which distributes fluid milk products on routes in the marketing area and who receives no fluid milk products during the month from dairy farmers or any other source except by transfer from a pool plant. Such person must provide proof satisfactory to the market administrator that the care and management of all the dairy animals and other resources necessary to produce the entire volume of fluid milk products (excluding transfers from pool plants) and the operation of the processing and distribution business is the personal enterprise of and at the personal risk of such person." 7 C.F.R. § 1137.11.
 
 
 [3]
 The language used by the district court appears appropriate when it referred to the contract as follows:
 "The contracts which have been mentioned seem at best to be a transparent effort to avoid the effect of the milk order, and it cannot be said that it was as a matter of law successful. The payment by the plaintiffs to the `sellers' was more like a deposit to ensure their milk supply than the payment of a price for a percentage interest. This is particularly true in view of the fact that the $15.00 amount was always returnable in the event of sale or termination of the contract. There was much other evidence adduced at the hearing which renders questionable the plaintiffs' contention that they are owners of the cows, but this need not be specifically mentioned since the evidence to support the finding and conclusions of the judicial officer is substantial.
 This case is somewhat similar to the fact situation which appeared in United States v. Elm Spring Farm, (D.C.Mass., 1941), 38 F.Supp. 508, 127 F.2d 920. There a corporate `handler' of milk formed a cooperative association which took title to the dairy cattle of the producers giving mortgages and stocks. However, there was no substantial change in the manner of conducting the business or performance of the function as it existed prior to the alleged transfer. The court refused to recognize that the cooperative was a producer, saying:
 `Where the handler's business remains the same, where its method of doing business remains the same, and where the distribution of milk handled by it remains the same, to effect a transition from a handler to a producer requires something more than the passage of a few legal papers and the redesignation of the persons from whom they procure the milk.' 38 F.Supp. at 511."
 
 
 [4]
 The case is no longer in the situation as when it was previously before this court. Gem has since been found to be in continuous violation of the Order. See, United States v. Brown, 10 Cir., 331 F.2d 362